597 F.2d 872
 J. Alston ATKINS, Luther James Manning, b/n/f Linda P.
Manning, Jr., Marguerite Miller, b/n/f for Carroll
Miller, Appellants,
v.
Robert W. SCOTT, Governor of North Carolina, Ex Officio
Director of the Budgetof North Carolina, and Ex Officio
Chairman of the North Carolina Board ofHigher Education, and
his Successor in Office, Advisory Budget Commission ofNorth
Carolina,North Carolina Board of Higher Education, State
Board of Education of NorthCarolina, University of North
Carolina, Appalachian State University, EastCarolina
University, Elizabeth City State University, Fayetteville
StateUniversity, N. C.Agricultural & Technical State
University, N. C. Central University, PembrokeState
University, North Carolina School of the Arts, Western
CarolinaUniversity, Winston-Salem State University, and the
Board of Governors of theUniversity of NorthCarolina, Appellees.
 No. 77-2304.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 7, 1978.
Decided May 3, 1979.
 
 J. David James, Greensboro, N. C. (Johnathan R. Harkavy, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., J. Alston Atkins, Winston-Salem, N. C., on brief), for appellants.
 Andrew A. Vanore, Jr., Senior Deputy Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh N. C., on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, WINTER and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 This is an appeal by J. Alston Atkins, pro se plaintiff-appellant, and Luther James Manning and North Carolina Alumni and Friends Coalition, et al, intervening plaintiffs-appellants (appellants), from a decision of the district court refusing to issue a preliminary injunction pursuant to FRCP 65(a). We have jurisdiction to entertain such appeal pursuant to 28 U.S.C. § 1292(a)(1), and affirm the district court's refusal to issue a preliminary injunction. Appellants also appeal the district court's determination that Chapter 922 of the 1975 Session Laws of North Carolina is not unconstitutional on its face. For reasons to be stated Infra, we are without jurisdiction to review that determination.
 
 
 2
 The underlying action in this case alleges that North Carolina operates and supports, financially and otherwise, a racially dual system of higher education. The proposed addition of a School of Veterinary Medicine (SVM) is only one aspect of the case, but is the one immediately at hand.[1]
 
 
 3
 After it became known that a veterinary school was in the offing, appellants filed a motion for a preliminary injunction seeking to enjoin the Board of Governors of the University of North Carolina and any persons, agency, or other entity acting in concert with or on behalf of the Board of Governors from taking any action implementing or tending to implement the decision of the Board of Governors made on or about December 18, 1974 to establish a School of Veterinary Medicine on the campus of North Carolina State University at Raleigh (NCSU). In their motion for a preliminary injunction, appellants also requested the district court to enjoin the Board of Governors and any persons, agency, or other entity acting in concert with or on behalf of the Board of Governors from basing any decision as to where new schools or new programs are to be located upon comparative evaluations of physical and academic facilities of institutions within the University of North Carolina, except upon an affirmative showing that such a decision is in furtherance of the Board of Governors' duties and obligations under the United States Constitution. Both sides in the case seem to construe the last clause mentioned as meaning that any new program must be located so as to lessen any existing racial statistical imbalance.
 
 
 4
 The district court held a hearing on the motion for a preliminary injunction. On the basis of oral testimony adduced at the hearing, the contentions of the parties as disclosed by the pleadings and briefs filed with the court, the stipulations of fact entered into by the parties, and the answers of appellees to interrogatories, the district court made, among others, the following factual determinations which are not clearly erroneous. The University of North Carolina is composed of sixteen constituent institutions of higher education supported by the State of North Carolina. The Board of Governors exercises controlling supervision and direction over the sixteen constituent institutions that comprise the University of North Carolina. Prior to 1954, the public institutions of higher education maintained as of that date by the State of North Carolina were maintained on a racially exclusive basis, i. e., where members of only one race were admitted and enrolled. During the period from 1955 through 1965, maintenance of the constituent institutions of the University of North Carolina on a racially exclusive basis was gradually eliminated. The State of North Carolina has been gradually eliminating vestiges of the racially dual system of higher education that existed prior to 1954.[2] A consideration of statistical information concerning the system of higher education available for the years 1969-1976 reflects a slow but steady increase in student desegregation in the system. The general concern over the efforts of the State of North Carolina to disestablish a racially dual system of higher education is reflected in the history of the decision-making process followed in determining where to locate a School of Veterinary Medicine in North Carolina.
 
 
 5
 Following is a brief synopsis of the district court's extensive factual determinations with regard to the decision-making process followed by North Carolina in determining where to locate a School of Veterinary Medicine. In 1970, the Board of Higher Education, a predecessor to the Board of Governors, engaged the services of Calvin W. Schwabe of the School of Veterinary Medicine at the University of California at Davis as a consultant and study director to determine the feasibility of establishing a School of Veterinary Medicine in North Carolina. Dr. Schwabe filed a report recommending that a School of Veterinary Medicine be located in the Research Triangle area of North Carolina and be jointly sponsored by NCSU and the University of North Carolina at Chapel Hill. Prior to 1954, NCSU was a white institution, and currently its student body, faculty and administrators are still predominately white. In 1974, the General Assembly of North Carolina directed the Board of Governors to consider and report to the General Assembly of 1975 its findings and recommendations for administrative and legislative action with respect to the extent and need for and the most effective and economical means of training additional veterinary medical practitioners in North Carolina. Pursuant to the General Assembly's direction, the Board of Governors appointed a subcommittee to consider and make recommendations concerning the establishment of a School of Veterinary Medicine in North Carolina. On August 1, 1974, John L. Sanders, Vice President of the University of North Carolina and Chairman of the Sub-Committee, met with Dean Webb, Dean of the School of Agriculture at North Carolina Agricultural and Technical State University (NCA&T), to solicit his opinions about the establishment of a School of Veterinary Medicine in North Carolina. Prior to 1954, NCA&T was a black institution, and currently its student body is still predominately black. Dean Webb stated he felt that North Carolina needed a School of Veterinary Medicine and that if one were established NCA&T should be a major participant. On September 12, 1974, Dean Webb appeared before the Sub-Committee and advised it that a School of Veterinary Medicine was needed in North Carolina and that at least a teaching element of the School should be located at NCA&T. Prior to Dean Webb's appearance before the Sub-Committee, there had been no communication to the Board of Governors from any official at NCA&T expressing an interest in seeing all or part of a School of Veterinary Medicine located on the NCA&T campus. Since two of the constituent institutions of the University of North Carolina were interested in becoming the site for a single program, the University engaged the services of Dr. C. R. Cole, Regents Professor and former Dean of the School of Veterinary Medicine at the Ohio State University, to conduct a study to determine the optimum location of a School of Veterinary Medicine in North Carolina. Dr. Cole was not asked to express an opinion on the racial impact or consequences of locating the School on the campus of either NCSU or NCA&T. On October 29, 1974, Dr. Cole submitted his report to the Board of Governors. That report contained the following conclusions and recommendations regarding the location of a School of Veterinary Medicine (referred to in the report as an SVM) in North Carolina:
 
 
 6
 "How well each university met the optimal criteria as a location for a school of veterinary medicine was measured quantitatively. The study yielded a total mean score of 499 favoring North Carolina Agricultural and Technical State University and a total mean score of 1051 favoring North Carolina State University. The location analysis revealed distinct advantages and disadvantages at both North Carolina A & T and at North Carolina State.
 
 
 7
 "Determination of the capital and operating cost of the proposed SVM was not within the purview of this study. However, the evaluation included physical and human resources and programs at each university which may be deducted from the cost of construction and operation of the SVM.
 
 
 8
 "The facilities and programs within reasonable distance (satellite facilities) of each university were also assessed relative to their potential contribution to the educational and research programs of a SVM. Such facilities were identified which should enhance the quality of the veterinary medical programs and represent vast savings in both the capital and operating costs of the SVM.
 
 
 9
 "On the basis of the data supporting the above conclusions, this study RECOMMENDS the placement of the proposed school of veterinary medicine at North Carolina State University-Raleigh(;)" ([3]
 
 
 10
 On November 18, 1974, the Board of Governors met to consider a recommendation presented by the Committee on Educational Planning, Policies, and Programs and the Committee on Budget and Finance that a School of Veterinary Medicine be established at NCSU. At this meeting, William H. Thomas, Chief of the Office of Civil Rights, United States Department of Health, Education and Welfare (HEW), informed the Board of Governors that he did not consider that an adequate racial impact study had been made about the location of the proposed School and that the Office of Civil Rights would object to a decision to locate the School of Veterinary Medicine at NCSU unless an adequate racial impact study were made. The Board of Governors concluded that a School of Veterinary Medicine should be established in North Carolina, but deferred a decision on where the School should be located until a more extensive racial impact study could be conducted. A racial impact study was conducted and the findings of the study were incorporated into a report from the Board of Governors to the General Assembly of North Carolina. The report included the following discussion of the projected racial impact of a School of Veterinary Medicine on NCSU and NCA&T:
 
 
 11
 "When two institutions request the same program at the same time and only one such program is needed, then the two proposals will be evaluated concurrently. The process is made somewhat more complex, though not different in kind, if one of the requesting institutions is predominantly white and the other is predominantly black. The primary consideration for the Board remains: Which proposed program is sounder and where can the better program be operated? The racial impact of the proposed program must also be determined for each institution. The outcomes could be several: (1) If the institutional capacity to maintain the program were greater in the institution which also promised the greater degree of integration, then that institution clearly would be favored. (2) If the capacity of the two institutions to maintain the proposed program were about equal, the institution with the superior prospect for furthering integration would have an advantage. (3) If the institutional capacity to maintain the program clearly favored one institution over another and the racial integration were about even, the former institution would have the advantage. (4) If the test of the capacity of the institution to maintain the program clearly favored one institution but on either or both of the racial impact tests (as to program and as to institution), the result favored the other institution, then explanation would be due if the former were chosen
 
 
 12
 "The case at hand is one in which the capacity of one institution to establish and operate a school of veterinary medicine clearly is superior to that of another and the racial impact factor in the two instances is about the same."With regard to the report submitted to the General Assembly of North Carolina by the Board of Governors, the district court stated:
 
 
 13
 "The report proceeds to analyze in detail the impact of the proposed school on integration of the student body and faculty at NCSU and NCA&T and concludes that the new school would have a slightly positive effect by increasing the percentage of minority members in each category on each campus (which means an increase in non-black students and faculty at NCA&T and of black students and faculty at NCSU). In neither case will the increase be particularly great however. When this factor is coupled with the great disparity between the capabilities of the two institutions to supply the necessary support functions for a School of Veterinary Medicine (as evaluated and set forth in the Cole Report), the Board of Governors was correct in concluding that 'the location of the school at North Carolina State University at Raleigh would be in the best interest of the State and that the elimination of the dual system of higher education in this State would not be impeded by that action' . . . ." ([4]
 
 
 14
 Based upon the recommendation of the Board of Governors, the 1975 General Assembly appropriated to the Board of Governors $500,000.00 for the fiscal year 1976-77 "for the purpose of planning and developing a School of Veterinary Medicine at North Carolina State University at Raleigh and such related activity at North Carolina Agricultural and Technical State University as the Board of Governors may deem appropriate and complimentary to the School of Veterinary Medicine." Following the conclusion of the hearing on the motion for a preliminary injunction, the Board of Trustees of NCSU announced its decision to relocate the site for the School of Veterinary Medicine from a site on the campus one mile from the library to another site two miles from the library next to the Faculty Club and on a dairy farm. The district court concluded of the change of location:
 
 
 15
 "While this relocation alters a small number of the factors which Dr. Cole considered when he compared the feasibility of locating the school at NCA&T and NCSU, it does not significantly effect (sic) the conclusion which Dr. Cole reached. In addition, the shift, while moving the School of Veterinary Medicine somewhat farther away from related resources such as the library building at NCSU, provides substantially more space for future development than would have been possible on the sites available at NCA&T."
 
 
 16
 With these facts at hand, the district court analyzed the request for a preliminary injunction under Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977), West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir. 1971), and Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42 (4th Cir. 1932). It correctly identified the factors to be considered as the balance of the likelihood of harm to the plaintiffs as opposed to that to the defendants; the likelihood of success; and the public interest.
 
 
 17
 The court concluded that it would be premature to assert which side would prevail. It noted that some factors tended to favor the plaintiffs, such as the history of De jure segregation, statistical racial imbalance in students and faculty, and the opinion of the District of Columbia which we have referred to in footnote 1. It also noted certain factors favored the defendants, among them that the racial impact of the veterinary school was carefully weighed and that as the record then stood, even using the plaintiffs' proposed standards, the veterinary school might lawfully be located at NCSU; and that although the plaintiffs might prevail on the broad case, the veterinary school might yet be located at NCSU.
 
 
 18
 It concluded that the delay occasioned by a preliminary injunction would more greatly harm the defendants than would the denial thereof harm the plaintiffs. The court found that the location at either NCA&T or NCSU would have a positive racial impact, and that, while the impact might be somewhat greater at NCA&T, that could not be said to be enough to "thwart the thorough consideration and planning" behind the location of the new school, to "cause needless delay" and "disrupt significantly the decision making process concerning public higher education in North Carolina," not to mention "considerably increased cost."
 
 
 19
 The court determined that it was in the public interest to have an academically sound and fiscally responsible public higher education system in North Carolina that is free of any vestiges of racial discrimination. It found that the plaintiffs had failed to demonstrate that new programs discriminated against minority students, faculty or administrators. It concluded that the delay occasioned by a preliminary injunction would add a cumbersome burden to the decision making process concerning new schedules and programs in the University system, would add cost, would deny black students, faculty and administrators educational opportunities, and as new programs were needed, would penalize all North Carolinians, black and white. Thus it found issuance of the preliminary injunction not to be in the public interest.
 
 
 20
 We are of opinion the district court's action in denial of temporary relief was not an abuse of discretion. Sinclair Refining Co., at 45. It is not remiss to add at this point that the district court found that there was no evidence in the record that, subsequent to 1955, any student had been denied admission to any State institution of higher learning in North Carolina because of race, or that any person seeking employment at any such institution had been denied it because of race.
 
 
 21
 Appellants also appeal the district court's determination that Chapter 922 of the 1975 Session Laws of North Carolina is not unconstitutional on its face. The Act is reproduced in the margin.[5]
 
 
 22
 Pursuant to 28 U.S.C. § 1292(b),[6] the district court certified for immediate appeal its determination that Chapter 922 is not unconstitutional on its face. However, no application was made to this court to permit such an appeal within the applicable time period set forth in § 1292(b). See note 6 Supra. Consequently, we are without jurisdiction to entertain the appeal in the above matter.
 
 
 23
 The order of the district court refusing to issue a preliminary injunction is accordingly
 
 
 24
 AFFIRMED.
 
 
 25
 The appeal from the district court's determination that Chapter 922 is not unconstitutional on its face is accordingly
 
 
 26
 DISMISSED.
 
 
 27
 WINTER, Circuit Judge, concurring and dissenting:
 
 
 28
 While I join in the judgment dismissing the appeal from the district court's determination of the facial constitutionality of Chapter 922 of the 1975 Session Laws of North Carolina and concur in the part of the opinion relating thereto, I dissent from the affirmance of the district court's order denying a preliminary injunction. I think that, under the applicable legal test, the district court abused its discretion in denying a preliminary injunction. In any event, the district court should be instructed to try and to decide the underlying dispute between the parties without further delay.
 
 I.
 
 29
 This suit was instituted on July 31, 1970 almost nine years ago to compel North Carolina to establish and maintain a unitary system of higher education and to eradicate every vestige of racial segregation and discrimination. That the suit is not a legally frivolous one appears from the opinion of the district court denying preliminary injunctive relief, viz:
 
 
 30
 There are . . . some factors tending to show that North Carolina has failed to completely disestablish racial discrimination in public higher education. These factors include (1) the history of De jure segregation in North Carolina public higher education, (2) the enrollment and employment statistics recited in Finding of Fact No. 7,[1] and (3) the conclusions reached by Judge Pratt in Adams v. Califano, Civil Action No. 3095-70 (430 F.Supp. 118) (D.D.C. April 1, 1977), that North Carolina's higher education desegregation plan is in violation of Title VI of the Civil Rights Act of 1964.
 
 
 31
 The motion for the preliminary injunction was filed four and one-half years later (December 19, 1974) after the Board of Governors of the University of North Carolina concluded to establish a new school the School of Veterinary Medicine on the campus of North Carolina State University (NCSU) in Raleigh, a formerly all-white institution, rather than at North Carolina Agricultural and Technical State University (NCA&T), a formerly all-black institution. The purpose of the restraint was preliminarily to enjoin the establishment of the new school at NCSU or at any other institution within the University of North Carolina except upon a showing that the establishment of the new school was in furtherance of a unitary system of higher education. The district court did not hear the motion until December 7, 1976 nearly Two years after it was filed and the district court did not decide the motion until June 28, 1977. The appeal to us followed.
 
 II.
 
 32
 As the district court recognized, the controlling authority on the question of whether or not to grant a preliminary injunction is Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189 (4 Cir. 1977). Since the district court's decision, we have also decided Fort Sumter Tours, Inc. v. Andrus, 564 F.2d 1119 (4 Cir. 1977), reiterating the principles of Blackwelder. Succinctly stated, these cases hold that the granting or withholding of interim injunctive relief should principally be as a result of balancing the harm to the plaintiff if relief is denied against the harm to defendant if the relief is granted. If the harm to plaintiff outweighs the harm to defendant, the injunction should issue; otherwise, it should be denied.
 
 
 33
 To my mind, the harm to plaintiff clearly outweighs the harm to defendant. The original plaintiff and those subsequently permitted to intervene sue to vindicate their personal stake and to redress a public wrong an alleged violation of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. If in fact North Carolina has not achieved a unitary system of higher education, it is manifest that the establishment of a new school may be an effective tool to assist in accomplishing that objective.[2] The establishment of the new school having a majority non-black enrollment at one of the formerly all-black institutions, particularly NCA&T, would help to redress the racial imbalance in the student body at that institution, and, more importantly, would be of substantial help in overcoming the reputation of NCA&T as an all-black institution. While the record does not disclose why the underlying lawsuit between the parties has been permitted to languish on the district court's docket for almost nine years, it is manifest that if the new school is built before the law suit is heard and decided and if plaintiffs prevail, an effective and potent tool for the creation of a unitary system will be irretrievably lost. Certainly no one can assume that if plaintiffs prevail the new school, if already built, will be disestablished and relocated. Thus, in my view the harm to plaintiff if an interim injunction is denied is substantial.
 
 
 34
 The district court assigned three reasons why the harm to North Carolina outweighed any harm to plaintiff: (1) added costs of development, (2) temporary denial of educational opportunities, and (3) disruption of the administrative process as it concerns higher education. I find none of these compelling and collectively I do not think that they outweigh potential harm to plaintiff.
 
 
 35
 The third reason, disruption of the administrative process, is clearly the weakest. If interim relief is granted, state officials will be ordered to do nothing until the main case is heard and decided. It can hardly be said that freezing the Status quo is particularly disruptive when state officials are not ordered to take other and divergent actions.
 
 
 36
 It is true that delay will have the effect of increasing eventual costs of capital construction and of postponing the day when educational opportunities in veterinary medicine are available in North Carolina. However, if, viewed as of the date that interim injunctive relief was sought, the main case had been conducted with dispatch, the underlying dispute would have been fully adjudicated and the need, if any, to direct the establishment of the new school at a formerly all-black institution as one of the means of achieving a unitary system of higher education would have been settled with minimal delay. Since North Carolina has waited all of these years to establish the new school, surely it would be no great burden to wait some months more to ensure that the location of the new school at NCSU breaches no statutory or constitutional duties.
 
 
 37
 In sum, I think that the balance of hardship is struck in favor of the black plaintiffs, and, under Blackwelder and Fort Sumter, a contrary decision constitutes an abuse of discretion. The vindication of the rights of blacks to equal treatment has been a slow and tortious process. Their rights and the overriding public interest in rooting out the vestiges of past discrimination surely warranted the interim injunctive relief that was denied.
 
 III.
 
 38
 The one fact which emerges starkly from this record is the leisureliness with which this litigation has been conducted. Whether the fault lies with the parties or the district court is neither clear nor, at this late date, significant. What is significant is that the underlying dispute between the parties should be tried and decided as a first order of business. I possess no information as to whether or not North Carolina has gone forward with the construction and establishment of the new school. If it has not, the location of the school as one of the tools for achieving the requisite unitary system may not be lost. But even if establishment of the new school has proceeded beyond the point of no return, dispatch in resolution of the main suit is still warranted. As the district judge stated, North Carolina's system of higher education is a dynamic, growing enterprise. If it is not presently being conducted in accordance with the Constitution and the will of Congress, the risk that other new schools will be established not in compliance with the law should be avoided.
 
 
 39
 I would direct the parties and the district court to try the case forthwith.
 
 
 
 [1]
 In Adams v. Califano, 430 F.Supp. 118 (D.D.C.1977), the court concluded that, "in violation of Title VI of the 1964 Civil Rights Act, (the Department of Health, Education and Welfare (HEW) is) continuing to grant federal aid to public higher education systems which have not achieved desegregation or submitted acceptable and adequate desegregation plans in the states of Arkansas, Florida, Georgia, North Carolina, Oklahoma, and Virginia." Id. at 120. It ordered that HEW adhere to a timetable in requiring the affected states to submit acceptable revised desegregation plans. Id. at 121. Pursuant to that court's order, the Board of Governors of the University of North Carolina submitted to HEW The Revised North Carolina State Plan for the Further Elimination of Racial Duality in Public Higher Education Systems, Phase II: 1978-1983. This Plan was accepted by HEW on May 12, 1978
 On June 9, 1978, defendants-appellees filed a motion with this court to enlarge the record on appeal to include The Revised North Carolina State Plan for the Further Elimination of Racial Duality in Public Education Systems, Phase II: 1978-1983.
 Defendants-appellees have filed a second motion to enlarge the record on appeal. They move that the record on appeal be enlarged to include the April 1978 Supplementary Report on veterinary medical education for North Carolina that was prepared by John L. Sanders, Vice President for Planning of the University of North Carolina.
 Although these reports might lend further support to our finding that the district court did not abuse its discretion in denying appellants' motion for a preliminary injunction, we deny the motions to enlarge the record on appeal, and have not considered them in deciding this case.
 
 
 [2]
 The district court pointed to the 1974 Revised North Carolina State Plan for the Further Elimination of Racial Duality in the Public Post-Secondary Education Systems as one indicia that North Carolina has been gradually eliminating vestiges of the racially dual system of higher education that existed prior to 1954. In that Plan, the Board of Governors made the following commitment:
 "An established part of the evaluation process applicable to each new curriculum proposed for approval by the Board of Governors is the projection of the racial impact of the adoption of the program on the student body of the institution that would sponsor it. Consistent with necessary consideration of educational quality, institutional mission and state-wide needs, the Board of Governors normally will not approve the establishment of any new academic program unless in its opinion such action would not impede the elimination of the dual system of higher education in North Carolina."
 The Board of Governors also committed itself as follows:
 "All administrative officials of the University and of the constituent institutions are sensitive to and will remain sensitive to the need to attempt to assess the racial impact implications of educational actions, such as the addition, deletion, expansion or contraction of academic programs. . . . A basic commitment is herein made by the Board of Governors to insure that such assessments are made, in recognition of the fact that one critical consideration (but not the only proper consideration) in resolving the basic questions about the role, scope and mission of the University is the need to encourage at all times, in every way feasible, the further elimination of identifiable racial duality. In any case where the strong possibility of a negative impact attributable to a particular course of action is perceived, the action will not be taken unless there are countervailing legitimate and compelling inducements, of a sound educational character, which militate in favor of the proposed action."
 On June 18, 1974, the Board of Governors further committed itself to assume the burden of proving that any action that might impede desegregation "would have some other educational objective of such compelling validity that its value would outweigh any anticipated negative effect of the particular action on racial composition of the student body of the institution."
 
 
 [3]
 The district court stated that at the hearing on the motion for a preliminary injunction, Dr. Cole testified,
 "that at the time of his visits to NCSU and NCA&T in October, 1974, it was apparent to him that NCSU had the necessary academic base, library base, and possible site location for the establishment of a quality school of veterinary medicine and that NCA&T lacked the necessary base facilities and resources for a quality school of veterinary medicine. Dr. Cole further concluded that although a School of Veterinary Medicine could be located at NCA&T, it would take at least six to ten years to establish such a school and would cost millions of dollars more to establish the school at NCA&T instead of at NCSU. Dr. Cole found that a quality School of Veterinary Medicine could be established at NCSU within three years and that the institution could admit its first students as early as 1979 at a much less cost than would be required were the school to be located at NCA&T. Dr. Cole concluded that based upon the educational merits and upon the cost and time that would be required in locating a School of Veterinary Medicine at either NCSU or NCA&T, it was his professional opinion that the School of Veterinary Medicine should be located at NCSU."
 
 
 [4]
 On December 18, 1974, the Board of Governors had concluded that there was a present need to establish a School of Veterinary Medicine in North Carolina, provided the General Assembly would make the necessary commitment of funds for that purpose; that the school should be located at NCSU; and that the location of the school at NCSU would be in the best interest of the people of the State and would not impede the elimination of the dual system of higher education in North Carolina
 
 
 [5]
 AN ACT TO APPROPRIATE FUNDS FOR THE ESTABLISHMENT OF A SCHOOL OF VETERINARY MEDICINE AT NORTH CAROLINA STATE UNIVERSITY AT RALEIGH
 Whereas, the General Assembly of North Carolina, by Resolution 171 of the 1974 Session, requested the Board of Governors of the University of North Carolina 'to give special attention to the need for training additional veterinary medical practitioners for North Carolina, and to report to the General Assembly of 1975, by not later than the 30th legislative day of the session, its findings and recommendations for administrative and legislative action with respect to the extent of the need for and the most effective and economical means of training additional veterinary medical practitioners for North Carolina'; and
 Whereas, the General Assembly by G.S. 116-11(3) has authorized the Board of Governors of the University of North Carolina to 'determine the functions, educational activities and academic programs of the constituent institutions' of the University of North Carolina; and
 Whereas, pursuant to the request of the General Assembly, the Board of Governors has studied extensively the need for and most effective and economical means of training additional veterinarians for North Carolina; has found that there is a present need to create a school of veterinary medicine in North Carolina; has established a school of veterinary medicine at North Carolina State University, conditional on the appropriation by the General Assembly of sufficient funds to initiate that school; and has filed with the General Assembly on the first day of its current session the report requested by the General Assembly in 1974; and
 Whereas, the recommendations of the Governor and Advisory Budget Commission for appropriations for 1975-77 do not make provision for financing a school of veterinary medicine; and
 Whereas, it is the conviction of the General Assembly that the State of North Carolina needs a school of veterinary medicine and needs it at the earliest feasible date; Now, therefore,
 The General Assembly of North Carolina enacts:
 Section 1. There is hereby appropriated to the Board of Governors of the University of North Carolina from the General Fund the sum of five hundred thousand dollars ($500,000) for the fiscal year 1976-77 for the purpose of planning and developing a school of veterinary medicine at North Carolina State University at Raleigh and such related activity at North Carolina Agricultural and Technical State University as the Board of Governors may deem appropriate and complementary to the school of veterinary medicine.
 Sec. 2. It is the sense of the General Assembly that the funds appropriated by the General Assembly of North Carolina shall be used for no purpose other than the planning, and developing of a school of veterinary medicine at North Carolina State University at Raleigh and related activity at North Carolina Agricultural and Technical State University as the Board of Governors may deem appropriate and complementary to the school of veterinary medicine.
 Sec. 3. This Act shall become effective upon ratification.
 In the General Assembly read three times and ratified, this the 26th day of June, 1975.
 
 
 [6]
 Section 1292(b) provides:
 "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, that application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order."
 
 
 [1]
 The following is a summary of some of the latest statistics set forth in Finding of Fact No. 7:
 As of 1976, black students accounted for 18.7% Of the total student population. Of these, 25.4% Of the black students attended formerly all-white institutions and 1.6% Of the non-black students attended formerly all-black institutions. Black students comprise 5.6% Of the students at formerly all-white institutions and non-blacks constitute 8.5% Of the students at formerly all-black institutions. Faculty figures for 1975 showed that blacks comprised 1.2% Of the faculty at formerly all-white institutions and most of the blacks are concentrated at the instructor level. In 1975, non-blacks comprised 34.5% Of the faculty at formerly all-black institutions. In 1973, 3.2% Of all administrators at formerly all-white institutions were black. In the same year, 10.9% Of all administrators at formerly all-black institutions were non-black.
 
 
 [2]
 State officials estimate that the new school will have a minority enrollment of approximately twenty percent, that is about 10 black students per year and about 50 non-black students